# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5538 | **DATE** | OCT. 28 , 2003 |
| **CASE TITLE** | DENISE BERRY, et al. v. ILLINOIS DEPT. OF HUMAN SERVICES, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment [48] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants Illinois Department of Human Services, Linda Renee Baker, Patricia Madden, Suzanne Varso, and Ugo Formigoni and against plaintiffs Lester Brodzik, Evelyn Carreon, Nasser Diab, Agnes Hayes, Ruth Loveless, Joseph Mungai, Ron Simmons, Henry Taylor, and William Thompson dismissing plaintiffs' causes of action with prejudice.

(11) ■ [For further detail see attached Memorandum Opinion and Order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 2 9 2003 | |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| cw | courtroom deputy's initials | | 10/28/2003 date mailed notice | |
| | | | mqm | |
| | | Date/time received in central Clerk's Office | mailing initials | |

DENISE BERRY, et al.,                    )
                                         )
                Plaintiffs,              )
                                         )
        v.                               )      No. 00 C 5538
                                         )
ILLINOIS DEPARTMENT OF HUMAN             )
SERVICES, et al.,                        )
                                         )
                Defendants.              )

**DOCKETED**

**OCT 2 9 2003**

## **MEMORANDUM OPINION AND ORDER**

The remaining plaintiffs in this case are seven current

or former employees of defendant Illinois Department of Human

Services ("IDHS"), all of whom were or are employed at IDHS's

Madden Mental Health Center ("Madden Center"). The seven

remaining plaintiffs are current employees Evelyn Carreon, Ruth

Loveless, and Ronald Simmons and former employees Nasser Diab,

Agnes Hayes, Joseph Mungai,[1] and Henry Taylor. In their First

Amended Complaint,[2] plaintiffs allege that they were subjected to

---

[1]Mungai is presently either on permanent disability or
disability leave.

[2]The original complaint was brought by 33 plaintiffs who
worked at six different IDHS facilities. Following a ruling on
defendants' motions to dismiss and for severance, see Berry v.
IDHS, 2001 WL 111035 (N.D. Ill. Feb. 2, 2001), plaintiffs filed
the First Amended Complaint, which is limited to employees of
Madden Center. Many of the present and original plaintiffs had
filed other lawsuits as well. See id. at *2-6.



adverse employment actions in retaliation for speaking out on matters of public concern. In addition to seeking declaratory and injunctive relief as against IDHS,[3] plaintiffs seek monetary damages from the following defendants: Secretary of IDHS Linda Renee Baker,[4] Madden Center's former Facility Director Ugo Formigoni, Madden Center Hospital Administrator Patricia Madden ("Madden"), and Madden Center Director of Personnel and Human Resources Suzanne Varso.[5] Presently pending is defendants' motion for summary judgment. As to each plaintiff, defendants contend the evidence does not support that the plaintiff spoke out on matters of public concern, that the plaintiff suffered an adverse employment action, and/or a causal link between the two. As to certain plaintiffs, it is contended that all or some defendants were not personally involved in any of the pertinent conduct. As to plaintiffs Diab and Hayes, defendants contend their claims are barred by res judicata.

---

[3]The IDHS is itself named as well as the other defendants in their official capacity, which is redundant. To the extent any official capacity claims for injunctive or declaratory relief survive, it would be sufficient to have Baker as a defendant in her official capacity. See Power v. Summers, 226 F.3d 815, 818-20 (7th Cir. 2000); Berry, 2001 WL 111035 at *8.

[4]Baker has been the Secretary of IDHS since February 2000.

[5]Varso has been in this position from December 1998 until at least March 2002. After Formigoni was assigned other duties in 1996, Madden and subsequently Varso as well were delegated the responsibility to recommend discipline in the name of Formigoni. The final decision as to a state employee's discipline is made by the Illinois Department of Central Management Services.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Turner v. J.V.D.B. & Associates, Inc., 330 F.3d 991, 994-95 (7th Cir. 2003); Palmer v. Marion County, 327 F.3d 588, 592 (7th Cir. 2003); Abrams v. Walker, 307 F.3d 650, 653-54 (7th Cir. 2002). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001); Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which he or she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Binz v. Brandt Construction Co., 301 F.3d 529, 532 (7th Cir. 2002); Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852 (1988). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits,
if any, which it believes demonstrate the absence
of a genuine issue of material fact." _Logan v._
_Commercial Union Ins. Co._, 96 F.3d 971, 978 (7th
Cir. 1996) (citing _Celotex Corp. v. Catrett_,
477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
265 (1986) (citation and internal quotation
omitted)). The moving party may discharge this
burden by "'showing'--that is, pointing out to
the district court--that there is an absence of
evidence to support the nonmoving party's case."
_Celotex_, 477 U.S. at 325, 106 S. Ct. 2548. Once
the moving party satisfies this burden, the
nonmovant must "set forth specific facts showing
that there is a genuine issue for trial." Fed.
R. Civ. P. 56(e). "The nonmovant must do
more, however, than demonstrate some factual
disagreement between the parties; the issue
must be 'material.'" _Logan_, 96 F.3d at 978.
"Irrelevant or unnecessary facts do not preclude
summary judgment even when they are in dispute."
_Id._ (citation omitted). In determining whether
the nonmovant has identified a "material" issue
of fact for trial, we are guided by the
applicable substantive law; "[o]nly disputes that
could affect the outcome of the suit under
governing law will properly preclude the entry of
summary judgment." _McGinn v. Burlington Northern_
_R.R. Co._, 102 F.3d 295, 298 (7th Cir. 1996)
(citation omitted). Furthermore, a factual
dispute is "genuine" for summary judgment
purposes only when there is "sufficient evidence
favoring the nonmoving party for a jury to return
a verdict for that party." _Anderson v. Liberty_
_Lobby, Inc._, 477 U.S. 242, 249, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986). Hence, a "metaphysical
doubt" regarding the existence of a genuine fact
issue is not enough to stave off summary
judgment, and "the nonmovant fails to demonstrate
a genuine issue for trial 'where the record taken
as a whole could not lead a rational trier of
fact to find for the non-moving party . . . .'"
_Logan_, 96 F.3d at 978 (quoting _Matsushita Elec._
_Indus. Co., Ltd. v. Zenith Radio Corp._, 475 U.S.
574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538
(1986)).

_Outlaw_, 259 F.3d at 837.

## I. SUMMARY JUDGMENT FACTS

Resolving all genuine factual disputes and drawing all reasonable inferences in favor of each plaintiff, the facts taken as true regarding each plaintiff are as follows.

### A. Carreon

Evelyn Carreon began working for IDHS in 1983 as a Registered Nurse I ("R.N. I"). She has been at Madden Center since February 1994 and is currently employed as a Registered Nurse II ("R.N. II")--Supervising Charge Nurse. Her primary duties are to provide a safe environment for patients and to treat patients with mental, physical, and emotional problems. Some of the patients she treats are violent. In 1997, Carreon was violently attacked by a patient. She became dizzy and vomited and was taken to a hospital by ambulance.

Under the applicable collective bargaining agreement, IDHS may involuntarily transfer nurses if sufficient voluntary bids are not received. The transfers are made in reverse seniority within respective job classifications. As of 1999, Carreon was assigned to Pavilion 2. On August 16, 1999, Carreon was informed in writing that she would be transferred to a day shift R.N. II position in the Madden Center Intensive Care Pavilion ("ICP") when it opened in the fall. Although Carreon believed another R.N. II had less seniority, Carreon was then the R.N. II with the least seniority. Carreon first heard of the impending transfer in July 1999. As late as June or July 2000, there was still talk of transferring her to the ICP. The ICP,

however, never opened. In January 2002, Carreon was informed that she would instead be transferred to Pavilion 7, which housed developmentally disabled patients. However, plaintiff was never transferred to Pavilion 7 and still remains in Pavilion 2. Subsequent to July 1999, Carreon's annual reviews have remained at the same level as in previous years and Carreon has received all appropriate pay increases.

Prior to July 1999, Carreon had not engaged in any union activity nor spoken out on any matters of public concern related to her employment. Beginning in July 1999, plaintiff protested her possible transfers, both orally and in writing. Her opposition to the transfers centered around being assigned to an area with highly violent patients and included concerns about safety. None of the written objections to the transfers were directed to one of the individual defendants nor were any of the objections spoken with any of the individual defendants present. Carreon provides no evidence showing that any of the named defendants were aware of her complaints about the transfer.

Although she was never actually transferred, Carreon contends she suffered adversity in being mistreated during the time period during which a transfer was a possibility. She contends it would have been improper to allow another nurse to bump her to a collateral transfer, as she was informed would happen, and also complains she never received written notice of this. Carreon, however, points to no contract provision that was violated and the transfer did not actually occur. She complains

that she continued to be told the transfer was impending even though the nurse that was to replace her had already retired and another nurse had volunteered to be transferred to ICP. She also complains that, during a lunch break in March or April 2000, she attempted to meet with a union representative about being bumped but the representative was escorted off the premises.

After July 1999, Carreon became active in union activities. Her activity on behalf of the union, however, related to a different IDHS facility, the Chicago-Read Mental Health Center. Her union activity primarily consisted of soliciting nurses to support the Teamsters Union instead of the Illinois Nurses Association that then represented the nurses. Plaintiff points to no sufficient evidence that any of the individual defendants were aware of her union activities. All plaintiff points to is her conclusory statement in an interrogatory answer that "administration" had the union representative removed from the premises in March or April 2000. This conclusory statement does not identify a particular administrator or show how Carreon would have personal knowledge of who ordered the removal.

Carreon also provides evidence that her immediate supervisor asked her how her coworker Mungai was performing. It was unusual to be asked so frequently and the circumstances implied that the supervisor was looking for negative information. Carreon's testimony does not specify when this questioning occurred other than while Mungai was one of her coworkers.

Mungai worked at Madden Center beginning in 1994 and was transferred off Pavilion 2 in February 2000. In June 1998, Mungai had been discharged, but the discharge was subsequently reduced to a suspension. The parties do not point to any evidence regarding when Mungai began working on Pavilion 2. Carreon's supervisor is not a named defendant and there is no evidence that the supervisor informed any named defendant that Carreon was refusing to provide negative information regarding Mungai.

### B. Diab

Nasser Diab worked as an R.N. I at Madden Center from September 13, 1994 until discharged on January 27, 2000 for the stated grounds of excessive days arriving late for his work shift. Diab contends that he was denied a change of work hours, denied a transfer in 1999, and discharged in retaliation for speaking out on patients' and employees' rights.

Madden Center is a residential facility that operates 24 hours a day. Diab worked in a pavilion where he provided direct patient care. He was assigned to the 8:00 a.m. to 4:00 p.m. shift. At some point, Diab began arriving late on a frequent basis because he was a single parent who had to drop his daughter off at school, which she started at 8:30 a.m. In 1997, Diab first requested that he be able to work from 9:00 a.m. to 5:00 p.m., but the request was not granted then or thereafter. He also offered to omit a lunch break to make up for arriving an hour late.

Defendants contend no employees providing direct patient care were allowed to work non-standard schedules. They contend that flexibility is not possible because allowing an employee to arrive late would necessitate that an employee from the prior shift work overtime until the other employee arrives. Diab, however, provides evidence supporting a genuine factual dispute on this issue. Diab testified regarding at least two caregivers, including an R.N., who regularly arrived later than the normal start time. The one R.N. had a flexible schedule between 1995 and 1997. The other employee was a Mental Health Technician who regularly arrived late as of 1999. To the best of Diab's knowledge, these two employees were never disciplined.[6] Diab also testified that overtime would not be necessary in order to have sufficient coverage. Multiple nurses are assigned during a shift so that it is not necessary to be at full strength at all times. Diab points out that nurses are all allowed lunch breaks during which time staffing is at less than full strength. However, as of 1999, there was no nurse providing direct patient care who was permitted to work a non-standard schedule.

Beginning October 13, 1999, Diab was suspended for 20 days based on 10 tardy arrivals between September 1 and 20, 1999. In December 1999, Diab was suspended pending discharge based on nine tardy arrivals between September 22 and October 3, 1999.

---

[6]Diab would not have personal knowledge of personnel files, but he would have personal knowledge regarding whether the coworkers were ever absent for substantial periods of time that might have been suspensions.

All those late arrivals were 58 minutes or longer. Diab does not dispute any of his late arrivals. There is no evidence of any other employee who had as many late arrivals without being disciplined. The length of the suspensions were in accordance with rules which state how much discipline is to be imposed based on the number of tardy days. Rules for Illinois state employees require that a person suspended more than 30 days in a calendar year be discharged.

Diab contends the following two instances are times in which he spoke out on behalf of patient rights. In the latter half of 1999, Diab put an entry in a patient's progress notes or on his chart that the patient desired further education. Regarding another patient, Diab told an Activity Therapist not to yell at the patient. Neither of these incidents were publicized outside IDHS and Diab did not direct either to the attention of any supervisor or defendant. However, he testified that these issues were of the type that may have been discussed at supervisor meetings which defendant Baker attended. Diab has never told any supervisor or manager that patients were being mistreated in the pavilion in which he worked.

Diab also contends he was active in asserting union rights. He testified that he expressed himself about being treated fairly, having a safe work environment, and efficient and effective patient care. Such discussions, however, were with other union members, not management or any individual defendant.

In 1995 or 1996, plaintiff had two discussions with defendant Formigoni regarding patients, the work environment, and Diab's car being stolen. Diab does not recall any specifics, but the general theme of their discussion was returning patients to a normal and stable life.

Diab has never discussed any patient or employee rights issues with Madden, nor has he discussed his scheduling problems with her.

Diab spoke to Varso about his scheduling problems. He also talked to her about generally improving patients' well-being and care, as well as about the work environment regarding time and the ability to be effective. Diab does not identify when these conversations occur nor provide details about the discussions as to patient well-being and care.

After a hearing before and recommendation by an Administrative Law Judge ("ALJ"), Diab's discharge was upheld by the Illinois Civil Service Commission. Diab then filed a suit for administrative review in the Circuit Court of Cook County, Illinois. None of the individual defendants were parties to that lawsuit. After considering the administrative record and briefs of the parties, the Circuit Court "dismissed with prejudice" the complaint for administrative review. The parties agree that the dismissal constituted an affirmance of the Civil Service Commission's decision. There is no indication that any further appeal was taken.

Additionally, Diab brought a Title VII action in this court in which he alleged that a suspension, a discharge,[7] and the denial of flex time that occurred in 1997 were because of national origin discrimination. The lawsuit was filed in January 1998 and an EEOC charge apparently was filed sometime in 1997. IDHS is the only defendant in that action. In February 2003, summary judgment was granted in defendant's favor and a judgment was entered dismissing the lawsuit with prejudice. See Diab v. IDHS, 2003 WL 256887 (N.D. Ill. Feb. 5, 2003).[8]

### C. Hayes

Agnes Hayes worked as an R.N. I in the Madden Center Intake Unit from 1993 until she was discharged effective May 26, 2000. Hayes's duties concerned assessing new hospital admissions, including interviewing new admissions, searching new admissions for contraband, and attending to the needs of new admissions.

Hayes had a history of discipline for abuse of time and failure to adhere to IDHS policies and procedures. Her discipline included oral reprimands in August and November 1999, a 3-day suspension in November 1999, and a 7-day suspension in January 2000, all of which were based on abuse of time or

---

[7]After a discharge was recommended in 1997, Diab was suspended pending a final determination. Because the final determination was in his favor, he was reinstated with full backpay and thus never actually discharged in 1997.

[8]This judgment was entered after defendants filed their motion for summary judgment. Defendants refer to it in their reply, but it is not addressed by plaintiffs.

tardiness. The stated reasons for Hayes's discharge were six instances of tardiness totaling 82 minutes and occurring between December 3, 1999 and February 7, 2000. While plaintiff points to her conclusory testimony that the people who testified against her at a Civil Service Commission hearing lied, she points to no specific evidence supporting a factual dispute that she was not tardy on the six dates. For purposes of summary judgment, it must be taken as true that she was a total of 82 minutes tardy on the six occasions.

Hayes contends the following constituted protected speech. In the last year of her employment, Hayes twice complained to Madden that payments were being made to a company that provided lab coats with name labels of former employees. Madden responded that she would look into the matter.

Hayes complained to the Director of Nursing that Hayes's direct supervisor was conducting private business during working hours. She complained because the supervisor did this work instead of watching patients while Hayes was at lunch. Hayes points to no evidence that the Director of Nursing relayed this information to any of the individual defendants.

Hayes spoke to a Madden Safety Department employee, her direct supervisor, and the Director of Nursing regarding air vents and window screens that were dirty and that it was sometimes too hot and sometimes too cold. One time she complained to Formigoni that the Intake area was too hot and he arranged to have fans brought in.

Hayes engaged in activity promoting the Teamsters Union as a representative of Madden nurses. This consisted of talking to Madden employees during her lunch hour. One time Hayes mentioned this to Varso who responded that it was "your choice." Hayes never raised this issue with any of the other individual defendants. There is no evidence that any of the defendants were opposed to the nurses being represented by the Teamsters Union. When a vote was taken, the Teamsters Union lost.

Loveless was reassigned to clerical duties because of allegations that she did not report patient abuse by one of her supervisees. The Director of Nursing requested that Hayes take Loveless's place as an R.N. II supervisor. Hayes declined because she did not want to change shifts, she did not want to be an R.N. II, she had high blood pressure, she was old and did not want to bother, and she did not want to "sabotage" Loveless. The Director of Nursing threatened to suspend Hayes if she did not take the position, but did not follow through on that threat. Hayes took no other action in aid of Loveless. There is no evidence that the Director of Nursing reported this incident to any of the individual defendants.

Hayes also believes she was disciplined so that there would be female comparative to offset sex discrimination claims of Diab. Hayes provides no particular evidence to support this contention. Hayes never took any steps to support Diab in his claims of discrimination.

Hayes spoke to Varso a few times about her union grievances not getting through and Varso responded that she would have to take that up with the union.

After a hearing before and recommendation by an ALJ, Hayes's discharge was upheld by the Illinois Civil Service Commission. On her complaint for administrative review, the Circuit Court of Cook County, Illinois affirmed the decision of the Civil Service Commission.

### D. Loveless

Ruth Loveless is an R.N. II at Madden Center. In August 1999, Loveless was the Charge Nurse in Pavilion 7. One of the employees she supervised was R.N. I Simmons. On August 17, 1999, Loveless was questioned regarding an allegation that Simmons had abused a patient. She stated that she did not observe abuse. She stated that she observed the patient attacking Simmons and that she and Mental Health Technician II Valarie Brown attempted to subdue the patient. She stated that Simmons used a "strong hold" to subdue the patient and get him into a restraint room. Unlike Loveless, Brown believed Simmons used too much force and reported it. For purposes of defendant's summary judgment motion, it must be taken as true that excessive force was not used and there was no patient abuse.

The Director of Nursing and Madden decided to remove Loveless from Pavilion 7 and reassigned her to administrative clerical duties based on Loveless's alleged failure to report the incident of patient abuse. Such a reassignment was consistent

with Madden policies requiring that abuse be reported and requiring that employees involved in allegations of patient abuse and supervisors who fail to report abuse allegedly occurring in their presence be reassigned to non-patient-care duties pending investigation of the allegations. The reassignment did not result in a decrease in salary, but Loveless was not allowed to work days on which she could have earned holiday pay nor was she permitted to work overtime. The clerical duty assignment lasted for nine and one-half months. Following an investigation that involved the Illinois State Police, Simmons was suspended three days on the stated grounds of failing to cooperate in the investigation and Loveless was suspended one day on the stated grounds of the charge nurse failing to follow policy and procedure.[9] The suspension did not occur until December 2001.

### E. Mungai

In 1994, Joseph Mungai began working as an R.N. at Madden. He provided nursing care to adult patients in a psychiatric unit. Since May 26, 2000, Mungai has been on medical leave, disability leave, or permanent disability.

---

[9]This stated ground is based on Loveless's deposition testimony recalling the stated grounds for the suspension. The personnel records that are provided, Def. Exh. 47, do not include records of the December 2001 suspension. However her personnel records include a June 5, 2002 memorandum related to subsequent disciplinary proceedings. That memorandum recites her past disciplinary history and lists the one-day suspension as being based on: "Failure to Follow Established Policy and Procedure; Inappropriate interaction with a Service Recipient who was in restraint."

Mungai has been disciplined a number of times. In May 1996, he was suspended five days for conduct unbecoming a state employee based on failing to follow the direction of the Central Nursing Supervisor. In June 1997, he was suspended ten days for insubordination and conduct unbecoming a state employee. In September 1997, Mungai was suspended 15 days for verbal abuse of a patient. In January 1998, he was suspended 30 days for verbal abuse of a patient. In June 1998, Mungai was discharged, but that was later reduced to a 60-day suspension. Any claim based on any of these disciplinary actions, however, is barred by the statute of limitations and a judgment dismissing those claims has already been entered. See Berry, 2001 WL 111035 at *13, 19. Within the statute of limitations, Mungai contends the following constitute adverse actions taken in retaliation for speaking out on matters of public concern: (a) being placed on a pharmacy committee; (b) the investigation following a supervising nurse's complaint about his distribution of a union flyer; and (c) the failure to promptly transfer him to another pavilion after a threat by a patient.

In February 2000, Mungai was selected to participate on a pharmacy committee for Madden Center. None of the individual defendants were involved in assigning him to the committee. On February 2, he sent a letter to the Director of Nursing protesting his appointment to this committee. Copies of the letter were not directed to any of the individual defendants.

The Director of Nursing responded the next day and removed Mungai from the committee as he had requested.

In late 1999, Madden Center nurses voted on whether they would rather be represented by the Teamsters Union than the Illinois Nurses Association. Mungai passed out flyers favoring the Teamsters. This included attempting to provide a flyer to a nursing supervisor in Pavilion 5. The supervisor filed a complaint and an investigation was conducted, including interviewing Mungai. Mungai was not disciplined as a result of the investigation nor was any discipline ever imposed based on conduct that was part of union activity. No individual defendant ever saw Mungai solicit signatures on union cards.

On February 17, 2000, patient WEJ verbally threatened Mungai. WEJ was thereafter restrained and did not physically injure Mungai. Mungai then left work without completing his shift or waiting for a replacement. He called in sick the next day and the following two days were scheduled off days. February 19 was a weekend holiday with no management staff working who could approve a transfer. Mungai returned to work on February 21 and was again threatened by WEJ. WEJ was again restrained without physically harming Mungai. Mungai again departed without completing his shift and called in sick on February 22. He wrote a letter to his supervisor stating that he would not return until either he or WEJ was transferred. On February 23, Mungai was transferred to a different pavilion. Mungai did not like the new pavilion and felt others, such as

Loveless and Diab, had received better assignments when they were transferred. Also, Mungai testified his new assignment was more dangerous because he was assigned to intake, which can be more dangerous because new patients who are psychotic are often not yet appropriately medicated.

Mungai has never communicated with Baker as to any subject. None of the other individual defendants have ever discussed issues of staffing, safety, or training with Mungai.

Mungai has not worked since May 26, 2000. He was on medical leave and eventually disability leave. Mungai's physician has opined that Mungai is now permanently disabled. When permanently disabled from performing in one's position, an employee must (a) resign and receive permanent disability benefits; (b) retire if eligible; or (c) apply for the Alternative Employment Program to seek a different position with the state. Mungai did not select any of the options, so IDHS has initiated termination proceedings based on his inability to perform his duties. If these proceedings result in the termination of Mungai's employment, he apparently would be placed on permanent disability.

### F. Simmons

Ronald Simmons is an R.N. at Madden Center. Simmons contends he was retaliated against when suspended three days based on the alleged August 1999 patient abuse incident which also involved Loveless.

As set forth regarding Loveless, another employee involved in the incident believed Simmons used excessive force in subduing a patient who attacked him. For present purposes, it must be assumed that Simmons did not use excessive force nor otherwise abuse the patient.

Two days after the incident, Lieutenant Mosely of Madden Center Security advised Simmons that he had been accused of patient abuse and that Mosely wanted to interview him. Simmons was thereafter placed on administrative leave, with full pay and benefits, pending the investigation. Simmons does not dispute that this was the appropriate procedure to follow.

On October 15, 1999, IDHS Internal Security Investigator Manuel Zepeda contacted Simmons and said he would likely arrange an interview for October 18 at Madden Center. On October 18, Simmons learned the Illinois State Police would participate in the interview. Simmons advised Zepeda that he would not attend such an interview without his attorney present and requested that Zepeda contact the attorney to arrange a date the attorney could be present.

At some point, Zepeda again requested that Simmons talk with the Illinois State Police.[10] Simmons again stated that he

---

[10]At one point in his deposition, Simmons referred to further conversations occurring in February and March or April 2000. However, Simmons's disciplinary proceeding was begun in November 1999 and resolved in December 1999. As of that time, Simmons had already been questioned by the State Police with his attorney present. Therefore, the discussions regarding beinginterviewed by the State Police must have occurred prior to February 2000.

would not do so without his attorney present. At one point, Simmons's attorney talked to Zepeda and requested that the Illinois State Police contact him directly to arrange an appointment. At one point, Zepeda told Simmons that it was unnecessary to have an attorney present and that he should give a statement without the attorney present. Eventually a statement was given to the Illinois State Police with Simmons's attorney present.

After the October 18, 1999 conversation between Zepeda and Simmons, Zepeda sent a memorandum to Madden stating that he had requested that Simmons come in for an interview with the Illinois State Police and that Simmons stated he would not do so without his attorney present. Contrary to Simmons's testimony, which must be taken as true for present purposes, Zepeda further reported that Simmons was asked to personally come to Madden Center in order to reschedule the appointment, Simmons refused to do so without an attorney present, and then Simmons requested a personal day for October 18.

On November 8, 1999, Simmons first received notice of a predisciplinary hearing based on engaging in conduct unbecoming a state employee. The predisciplinary hearing was held on December 7, 1999. Simmons had a union representative present. When told the basis for the charge, Simmons responded, as he presently testified, that he requested that Zepeda contact his attorney to arrange an interview date. The IDHS Employee Handbook requires that employees cooperate with an official

- 21 -

investigation. On December 16, 1999, Simmons's supervisor, Susan Strickland, ruled that he should be suspended for three days and Varso approved the suspension.

On a number of occasions, Simmons spoke with his supervisors, union officials, and his coworkers regarding patient and employee safety and employee discipline. At least one discussion was with the Director of Nursing. In 1998, Simmons spoke with Strickland about unfair employee discipline and unfair management decisions regarding employee work hours. Simmons cannot recall the specifics of this conversation. There is no evidence that any of the individual defendants were aware of Simmons's statements about safety and discipline.

During 1997 or 1998, Simmons served as a union steward for one year. Even when not a steward, Simmons assisted coworkers with grievances and other complaints. During 1999, Simmons was not a steward and only provided informal assistance to coworkers. There is evidence that Varso was aware of Simmons acting as a union steward at grievance proceedings. There is no evidence that any of the other individual defendants were aware of any of his union activity.

### G. Taylor

Henry Taylor worked as a housekeeper at Madden Center from May 26, 1992 through June 7, 2000. He claims he was constructively discharged in retaliation for requesting union representation at a predisciplinary hearing.

Taylor was frequently late for work. From 1993 through 1999, each of Taylor's performance evaluations indicated a problem with tardiness. From October 1999 through March 2000, Taylor had 10 tardies of less than 15 minutes and 16 of more than 15 minutes. He also had 11 unexcused or unreported absences. Taylor's tardiness was related to health problems.

Taylor received a five-day suspension for two unexcused absences. He was represented by the union at the predisciplinary hearing related to that suspension. A coworker with two unexcused absences received a 15-day suspension.

In March 2000, after five other instances of discipline ranging from a paper suspension to a 12-day suspension, Taylor was suspended pending discharge. Taylor requested that he be permitted to retire instead and that request was granted.

Baker signed the personnel form showing he retired. She had no knowledge of the disciplinary proceedings leading up to the decision to retire. Baker, Madden, and Varso were all unaware of any union rights Taylor exercised at any predisciplinary proceeding. Lower level management employees attended the predisciplinary hearings.

The final disciplinary proceedings began in January 2000. During part of the time, Taylor was hospitalized. Before retiring, Formigoni advised Taylor that if he returned to work for a short period of time before retiring in June, he would qualify for a pension. Taylor performed the suggested days of work. However, the State Employees' Retirement System of

Illinois thereafter determined that Taylor did not qualify for a pension. Plaintiff still could have qualified for a pension by making back contributions for his six-month probationary period, but did not make any such contributions. Formigoni also offered to permit Taylor to return to work for long enough to qualify for a pension, but Varso did not approve his returning to work.

## II. APPLICABLE LAW

### A. First Amendment Standards

The usual elements of a First Amendment retaliation claim by a public employee were recently stated in <u>Gustafson v. Jones</u>, 290 F.3d 895 (7th Cir. 2002).

> There are four elements to a First Amendment retaliation claim in the employment context. First, the plaintiffs must prove that their speech was a matter of public concern. Next, they must prove that their speech played at least a substantial part in the employer's decision to take an adverse employment action against them. If the plaintiffs can carry their burden on these two elements, the defendants can only prevail if they prove by a preponderance of the evidence that the government's interest, as an employer, in efficiently providing government services outweighs the employees' First Amendment interests, or if they can prove that they would have disciplined the employees even in the absence of the speech.
> 
> * * *
> 
> Whether a government employee's speech addresses a matter of public concern depends upon "the content, form, and context of [the speech] as revealed by the whole record." <u>Connick v. Myers</u>, 461 U.S. 138, 147-48 (1983). Of these three factors, content is most important. <u>Button v. Kibby-Brown</u>, 146 F.3d 526, 529 (7th Cir. 1998); <u>Marshall v. Porter County Plan Comm'n</u>, 32 F.3d 1215, 1219 (7th Cir. 1994); <u>Belk v. Town of Minocqua</u>, 858 F.2d 1258, 1264 (7th Cir. 1988). The "public concern" element is

> satisfied if the speech can fairly be said to
> relate to a matter of political, social, or other
> concern to the community, rather than merely a
> personal grievance of interest only to the
> employee. Connick, 461 U.S. at 146.

Gustafson, 290 F.3d at 906-07.

Although one of the elements of a § 1983 First Amendment retaliation claim is often satisfied by a showing of an "adverse employment action," the required element is not that specific. The adverse action need not be an employment action, that is it need not affect the employee's conditions of employment. Power v. Summers, 226 F.3d 815, 820 (7th Cir. 2000); Trzeciak v. Village of LaGrange, 2003 WL 1193319 *12 (N.D. Ill. March 13, 2003). All that is required is that there be some form of retaliatory conduct that is sufficiently adverse to deter the exercise of an employee's First Amendment rights. Power, 226 F.3d at 820-21; DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 192 (7th Cir. 1995); Trzeciak, 2003 WL 1193319 at *12. It "must be sufficiently adverse to present an actual or potential danger that the speech of [the plaintiffs] will be chilled." DeGuiseppe, 68 F.3d at 191. Stated another way, the adverse action inflicted must be "likely to chill a person of ordinary firmness from continuing to engage in that activity." Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998). See also Strouss v. Michigan Department of Corrections, 250 F.3d 336, 345 (6th Cir. 2001); Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001); The Chicago Reader v. Sheahan, 141 F. Supp. 2d 1142, 1144-45 (N.D. Ill. 2001). Adversity is measured by an objective standard and

it need not actually deter the plaintiff from speaking out.  See
DeGuiseppe, 68 F.3d at 191 ("actual or potential danger"), 192
("it need merely create the potential for chilling employee
speech"); Dawes, 239 F.3d at 493; Cannon v. Burkybile, 2002 WL
448988 *6 (N.D. Ill. March 22, 2002).  "This objective inquiry is
'not static across contexts,' but must be 'tailored to the
different circumstances in which retaliation claims arise.'"
Dawes, 239 F.3d at 493 (quoting Thaddeus-X v. Blatter, 175 F.3d
378, 398 (6th Cir. 1999)).

        Much of plaintiffs' purported protected conduct is
related to union rights or activity.  The public concern standard
is designed for activity involving First Amendment speech.  Union
rights and organizing, however, may involve First Amendment
associational rights.  To the extent it is purely an issue of
exercising the right to associate, the public concern standard
does not necessarily apply.  See Balton v. City of Milwaukee,
133 F.3d 1036, 1040 (7th Cir. 1998); id. at 1041 (Cudahy, J.,
concurring in judgment); Quinn v. Village of Elk Grove Board of
Fire & Police Commissioners, 2002 WL 31875464 *3-4 (N.D. Ill.
Dec. 24, 2002).  In hybrid situations, where there is an issue of
speaking out on union-related activities, the public concern
standard should be applied while recognizing that there may be
distinctions when applying it to conduct that also involves
associational rights.  See Balton, 133 F.3d at 1040; Quinn, 2002
WL 31875464 at *4.  Advocating on behalf of or for a union is
protected First Amendment speech.  McGill v. Board of Education

of Pekin Elementary School Dist. No. 108 of Tazewell County, Ill., 602 F.2d 774, 778 (7th Cir. 1979); Quinn, 2002 WL 31875464 at *4; Cunningham v. Village of Mount Prospect, 2002 WL 31628208 *5 (N.D. Ill. Nov. 19, 2002); Terry v. Village of Glendale Heights, 1989 WL 106623 *5-6 (N.D. Ill. Sept. 13, 1989). Pursuing a matter of individual concern through a union grievance process does not make it protected First Amendment conduct. See Griffin v. Thomas, 929 F.2d 1210 (7th Cir. 1991); Balton, 133 F.3d at 1041 (Cudahy, J., concurring in judgment); Majka v. City of Chicago, 1995 WL 654026 *7-8 (N.D. Ill. Nov. 6, 1995).

## B. Res Judicata (Diab and Hayes)

Defendants contend that the claims of Diab and Hayes are barred by res judicata (claim preclusion) in that they could have raised their present claims in the administrative review cases that they litigated in the Circuit Court of Cook County, Illinois. Since the underlying judgments are state court cases, Illinois law as to res judicata is applied. See 28 U.S.C. § 1738; Licari v. City of Chicago, 298 F.3d 664, 666 (7th Cir. 2002); Durgins v. City of East St. Louis, Ill., 272 F.3d 841, 843 (7th Cir. 2001). The three requirements for applying res judicata are: (1) a final judgment on the merits in the prior action; (2) identity of the causes of action; and (3) identity of the parties or their privies. River Park, Inc. v. City of Highland Park, 184 Ill. 2d 290, 703 N.E.2d 883, 889 (1998); Licari, 298 F.3d at 666; Allen v. City of Zion, 2003 WL 22078374 *2 (N.D. Ill. Sept. 3, 2003). Res judicata applies to claims

that are part of the same cause of action and that were or could
have been raised in the prior proceeding. General Auto Service
Station LLC v. City of Chicago, Ill., 319 F.3d 902, 906 (7th Cir.
2003); Licari, 298 F.3d at 667; Durgins, 272 F.3d at 843.

It is undisputed that the First Amendment retaliation
claims presently before the court were not raised in the state
court administrative review cases. Plaintiffs contend res
judicata cannot apply because, as defendants concede, they could
not have raised constitutional claims before the Illinois Civil
Service Commission. However, they could have included such
claims in the complaints for administrative review that were
before the Circuit Court. Because the claims are part of the
same cause of action that each plaintiff raised in the Circuit
Court, the present claims are barred if the other two
requirements for res judicata are satisfied. Durgins, 272 F.3d
at 843-44.

There is no dispute that the decisions of the Circuit
Court in Diab's and Hayes's respective cases were final judgments
on the merits.

An issue exists, however, as to whether the identity of
parties requirement is satisfied. IDHS was a party to the
administrative review cases, but the individual defendants were
not. As to res judicata based on a prior federal judgment, the
law is clear that state employees sued in their individual
capacity are not considered to be in privity with the state
itself. Conner v. Reinhard, 847 F.2d 384, 394-96 (7th Cir.),

cert. denied, 488 U.S. 856 (1988); Gray v. Lacke, 885 F.2d 399, 405 (7th Cir. 1989), cert. denied, 494 U.S. 1029 (1990); Berry, 2001 WL 111035 at *15. The Seventh Circuit has indicated, without actually holding, that Illinois would apply the same rule. See Davis v. City of Chicago, 53 F.3d 801, 803-04 (7th Cir. 1995); Charles Koen & Associates v. City of Cairo, 909 F.2d 992, 999 n.7 (7th Cir. 1990). But see Mandarino v. Pollard, 718 F.2d 845, 850 (7th Cir. 1983), cert. denied, 469 U.S. 830 (1984). However, Illinois courts hold that, where the employer's liability is based on vicarious liability, the employee and employer are in privity for purposes of res judicata. Leow v. A & B Freight Line, Inc., 175 Ill. 2d 176, 676 N.E.2d 1284, 1286 (1997). This rule has been applied to public employers, not just private employers. See Downing v. Chicago Transit Authority, 162 Ill. 2d 70, 642 N.E.2d 456, 458 (1994) (followed in Leow, supra). Also, finding privity to exist in such situations would be consistent with the Restatement (Second) of Judgments § 51 (1982). See Sterling v. United States, 85 F.3d 1225, 1230 (7th Cir. 1996) (noting that Gray and Koen are inconsistent with § 51). The Illinois courts often follow the Restatement (Second) of Judgments. See, e.g., River Park, 703 N.E.2d at 892-93. In the administrative review cases, any "liability" on the part of IDHS would be based on the conduct of IDHS officials and employees being attributed to IDHS. It appears that, in the present situation, Illinois courts would find the individual defendants to be in privity with IDHS and therefore res judicata

would apply. However, to the extent <u>Davis</u> and <u>Koen</u> accurately predict the manner in which the Illinois Supreme Court would resolve this issue, only the official capacity claims would be barred, which would be Diab's and Hayes's claims for declaratory and injunctive relief.[11]

Based on <u>res judicata</u>, the entire claims of Diab and Hayes will be dismissed with prejudice. However, because the law is unclear as to the applicability of <u>res judicata</u> to the claims against the individual defendants, the merits of Diab's and Hayes's claims against the individual defendants will still be considered. As is discussed in sections III(B) and III(C) <u>infra</u>, those claims are subject to dismissal on other grounds as well.

### III. APPLICATION TO EACH PLAINTIFF'S CLAIMS

#### A. Carreon

As to Carreon, defendants contend (a) she suffered no adverse action; (b) she did not engage in protected speech; (c) the individual defendants were not personally involved; and (d) the transfers would have been proposed regardless of her purported First Amendment activity.

Carreon was not discharged and still works in the same pavilion to which she was previously assigned. There is no evidence that there are currently any plans to transfer her.

---

[11]As to Diab's federal lawsuit, any <u>res judicata</u> effect would be limited to the official capacity claims for declaratory and injunctive relief.

Thus, no case or controversy presently exists that would support a claim for declaratory and injunctive relief as against IDHS. Carreon's official capacity claims will be dismissed. Only the individual capacity claims need be further considered.

Although Carreon was informed she would be laterally transferred, she was never actually transferred. Defendants contend this means she suffered no adverse action. If this were a Title VII retaliation claim requiring a materially adverse effect, see Gawley v. Indiana University, 276 F.3d 301, 314-15 (7th Cir. 2001); Ribando v. United Airlines, Inc., 200 F.3d 507, 511 (7th Cir. 1999); Speer v. Rand McNally & Co., 123 F.3d 658, 664 (7th Cir. 1997); Trzeciak, 2003 WL 1193319 at *11, that contention might have merit. As discussed in § II(A) supra, plaintiffs' § 1983 First Amendment retaliation claims only require a form of retaliatory conduct that is sufficiently adverse to deter the exercise of First Amendment rights. Here, Carreon had previously been attacked by a patient and was told that she was to be transferred to a pavilion expected to contain more violent patients than the pavilion to which she was then assigned. Actually transferring an employee to a location with more potential for violence, even if it is a lateral transfer, is an action that is sufficiently likely to deter speech. Cf. Strouss, 250 F.3d at 342-43 (laterally transferring nurse to area of prison that housed inmates who had threatened her was objectively intolerable so as to satisfy adverse employment action requirement for Title VII retaliation claim); Gustafson v.

Jones, 117 F.3d 1015, 1021 (7th Cir. 1997) (law well established that transfer to a less desirable position can be a basis for a First Amendment retaliation claim). Just as an actual transfer to the ICP would be objectively sufficient to deter speech, being told that the transfer was upcoming would as well. Cf. Trzeciak, 2003 WL 1193319 at *12 (lowered job rating that had potential for affecting promotion would be sufficient deterrent even if it subsequently did not affect rankings for the promotion). An employee would be just as likely or more likely not to speak out in order to avoid a threatened transfer than to not speak out once transferred. The threatened transfer to ICP satisfies the adverse action requirement. Preventing Carreon from meeting with a union representative who might aid her in avoiding the transfer, would also be conduct that would be sufficiently likely to deter speech. As for the possible transfer to Pavilion 7 housing developmentally disabled patients, however, Carreon does not point to evidence showing that this transfer was such a negative assignment that it would be likely to deter speech.[12]

---

[12]In her brief, plaintiff contends Pavilion 7 also contained violent patients. Pl. Answer Brief at 3 (citing Rule 56.1 Statement ¶ 48), at 18 (citing Rule 56.1 Statements of Loveless and Simmons). The deposition testimony cited in ¶ 48 does not support this contention and Carreon's Rule 56.1 Statement does not contain this contention. There is no citation to a specific paragraph of Loveless's and Simmons's Rule 56.1 statements. Carreon may be referring to the fact that the incident central to Carreon's and Simmons's discipline was started when Simmons was attacked by a Pavilion 7 patient. One attack, however, does not show that Pavilion 7 was more violent than Pavilion 2.

As discussed in § II(A) _supra_, advocating for a union is protected speech. Carreon's campaigning for the Teamsters was protected speech. Carreon's complaints about being transferred is not speech on a matter of public concern. Her complaints concerned her safety at Pavilion 2 and whether her skills were appropriate for the developmentally disabled. She was advancing an issue of personal interest, not a public concern. _See_ _Friend v. Lalley_, 194 F. Supp. 2d 803, 811-12 (N.D. Ill. 2002); _Collins v. Village of Woodridge_, 96 F. Supp. 2d 744, 755 (N.D. Ill. 2000). _Compare_ _Ramos v. Murphy_, 1992 WL 80381 *3 (N.D. Ill. April 10, 1992). Carreon does not argue that the attempt to obtain negative statements from her about Mungai implicate First Amendment rights.[13]

Although Carreon has shown some adverse action and some protected activity, she does not provide any basis for inferring her activity on behalf of the Teamsters Union played a substantial part in the decision to impose the adverse action. Carreon was notified of the decision to transfer before she had campaigned for the Teamsters. Additionally, although plaintiff had believed otherwise at the time, it is undisputed that initially no one volunteered for the ICP assignment and she was the R.N. II with the lowest seniority. Thus, she was selected

---

[13]Even if the solicitation of negative statements implicates any First Amendment rights, there is no evidence linking that conduct to any adverse action or to the individual defendants.

for the transfer regardless of any improper motive.[14]  Moreover,
there is no evidence that any of the individual defendants knew
that Carreon had solicited coworkers to support the Teamsters
Union.  Even if the complaints related to the transfers were
found to be protected activity, there is also no evidence that
any of the individual defendants were aware of those complaints.
There is no basis for finding any of the individual defendants
liable for First Amendment retaliation of Carreon.  Carreon's
claims will be dismissed in their entirety.

### B. Diab

As is discussed in § II(B) supra, Diab's claims are
barred by res judicata.  However, because the law is unsettled as
to the application of res judicata to the claims against the
individual defendants, those claims will also be addressed on
their merits.

Defendants contend Diab's claims fail on the merits
because he cannot show that:  (a) he engaged in protected
activity;  (b) his purported protected activity was a motivating
factor in his discipline;  or (c) the personal participation of
the individual defendants in any unlawful retaliation.
Defendants also contend the evidence shows Diab would have been
disciplined regardless of engaging in any protected activity.

---

[14]By June 2000, however, another employee had volunteered
for the position, but Carreon was still being told she would be
transferred.

Diab contends that his 1997 EEOC charge and subsequent Title VII suit alleging national origin discrimination constitute protected activity. The Seventh Circuit, however, has held that such conduct is not per se protected activity, including lawsuits alleging constitutional violations. Glatt v. Chicago Park District, 87 F.3d 190, 193 (7th Cir. 1996); Zorzi v. County of Putnam, 30 F.3d 885, 895-96 (7th Cir. 1994); Belk, 858 F.2d at 1262-63. First Amendment protections only apply if the particular administrative complaint or lawsuit constitutes speech on a matter of public concern. Zorzi, 30 F.3d at 896. An ordinary complaint of discrimination that only raises issues personal to the complaining employee will not constitute speech on a matter of public concern. Yatvin v. Madison Metropolitan School District, 840 F.2d 412, 418-20 (7th Cir. 1988); Altman v. Hurst, 734 F.2d 1240, 1244 & n.10 (7th Cir.), cert. denied, 469 U.S. 982 (1984). Compare Zorzi, 30 F.3d at 896-97; Auriemma v. Rice, 910 F.2d 1449, 1460 (7th Cir. 1990), cert. denied, 501 U.S. 1204 (1991). Here, Diab's EEOC proceeding and Title VII lawsuit involved personal claims regarding his being suspended, discharged, and denied flex time. He did not raise general issues of discrimination at IDHS and his case was not publicized. There was nothing about the content, form, or context of those proceedings that made them matters of public concern.

Diab's single entry on a chart that a patient desired further education, even if subsequently discussed at a staff meeting addressing the patient's progress, is not speaking out on

a matter of public concern. It was purely for internal discussion of one patient's individualized treatment.

Telling a coworker not to yell at a patient is also not speaking out on a matter of public concern. Diab did not thereafter report the coworker for abuse nor mention the incident to any supervisor.

Speaking out on general issues of employee rights and patient care could be speaking out on matters of public concern. However, simply raising such issues in nonpublic discussions with nonmanagement employees is not raising the issue in a manner that would constitute raising them as a public concern. In any event, the individual defendants could not have retaliated for such speech because there is no evidence they were aware of his discussions with union members.

Diab had two discussions with Formigoni regarding patients and work environment, but cannot recall the specifics of such discussions other than that they involved returning patients to normal life. Diab cannot meet his burden of establishing that this was speaking out on matters of public concern. Moreover, such discussions occurred approximately three to four years before the alleged retaliation began and there is no evidence that Formigoni participated in deciding to discipline Diab. Thus, even if this constituted speaking out on matters of public concern, evidence does not support that such speech played a substantial part in the decisions to discipline Diab.

Diab's discussions with Varso regarding his scheduling problems was speech regarding personal issues, not speech on a matter of public concern. His discussions with her regarding patient care and work environment issues could be speech on a matter of public concern. While patient care at a public institution may be a matter of public concern, Diab's discussions were limited to private conversations with Varso regarding appropriate practices. In that form, it does not necessarily constitute speech on a matter of public concern. See Kuchenreuther v. City of Milwaukee, 221 F.3d 967, 974-75 (7th Cir. 2000). But even assuming this constituted speech on a matter of public concern, Diab does not show that it was a motivating factor in his discipline.

Diab was first denied requested flex time in 1997. He was first disciplined for tardiness in late 1999. Plaintiff contends he did not have any issues as to tardiness until 1997. However, his testimony does not establish when any of the conversations with Varso occurred. Moreover, the evidence shows that he did not have prior tardiness problems because he did not previously drop his daughter off at school at 8:30 a.m. There is no evidence that any conversation with Varso was shortly thereafter followed by a change in enforcing tardiness rules. There is no evidence that Varso was involved in recommending Diab for discipline or in directing that time rules be strictly enforced as to Diab. The evidence does not support that Diab's

conversations with Varso were a factor in the decision to deny flex time or discipline Diab.

Diab contends that a retaliatory motive can be inferred from the fact that other employees were treated more favorably. Even assuming Varso or another individual defendant was involved in decisions regarding both Diab's and the comparative's work hours, plaintiff fails to show that other similarly situated employees were treated more favorably. The R.N. who had a flexible work schedule had such a schedule in 1997 or earlier, not during the same time period as Diab. The other employee with a flexible schedule was not a nurse.

Diab has not provided evidence supporting that he engaged in protected activity that was a factor in the decision to subject him to any adverse action. Diab's claims will be dismissed in their entirety based on res judicata. Alternatively, the claims would be dismissed for failing on the merits.

### C. Hayes

As is discussed in § II(B) supra, Hayes's claims are barred by res judicata. However, because the law is unsettled as to the application of res judicata to the claims against the individual defendants, those claims will also be addressed on their merits.

Defendants contend Hayes's claims fail on the merits because she cannot show that: (a) she engaged in protected activity; (b) her purported protected activity was a motivating

factor in her discipline; or (c) the personal participation of the individual defendants in any unlawful retaliation. Defendants also contend the evidence shows Hayes would have been disciplined regardless of engaging in any protected activity.

Hayes provides evidence of seven possible circumstances that she contends constitute engaging in protected activity. As to only three, however, is there any evidence that one of the individual defendants was aware of Hayes's activity. Therefore, those are the only three that need be considered: (a) Hayes complained to Madden about the lab coat purchases; (b) Hayes once mentioned to Varso that she supported the Teamsters; and (c) Hayes spoke to Varso about her grievances not being processed. As has been previously discussed, (b) is protected activity. See § II(A) supra. There is no evidence that the grievances involved anything other than Varso's personal grievances. Therefore, that conduct does not involve speech on a matter of public concern. See id. As to (a), there is no evidence that an employee was profiting from the sales; it was apparently a matter of inefficient purchasing procedures. There is also no evidence that the expense was substantial or that the lab coats were totally unusable with outdated employee names. No attempt was made to report this to an inspector general, the press, or anyone outside the agency. While the expenditure of public funds is the type of content that is generally of public concern, Propst v. Bitzer, 39 F.3d 148, 152 (7th Cir. 1994), cert. denied, 514 U.S. 1036 (1995); Domina v. Van Pelt, 235 F.3d

1091, 1098 (8th Cir. 2000); Munafo v. Metropolitan Transportation
Authority, 2003 WL 21799913 *9 (E.D.N.Y. Jan. 22, 2003), not
every discussion of government expenditures constitutes protected
speech.  See Rahn v. Drake Center, Inc., 31 F.3d 407, 411-12 (6th
Cir. 1994), cert. denied, 515 U.S. 1142 (1995); Roth v. Veteran's
Administration, 856 F.2d 1401, 1405-06 (9th Cir. 1988); Barnes v.
McDowell, 848 F.2d 725, 734 (6th Cir. 1988), cert. denied, 488
U.S. 1007 (1989); Munafo, 2003 WL 21799913 at *9.  The minor
expenses involved, the lack of any allegations of fraud or
corruption, and the internal form of the communication prevent
Hayes's statements to Madden from being speech on a matter of
public concern.  Cf. Kuchenreuther, 221 F.3d at 975; Barnes, 848
F.2d at 734-35; Rahn, 31 F.3d at 412.

However, even if the statements to Madden were speech on
a matter of public concern, Hayes does not provide evidence
showing those comments were a motivating factor in the decisions
to discipline her.  Neither does she point to any evidence that
the statement to Varso about the Teamsters (or even the
statements about the grievances) were a motivating factor in her
discipline.  Moreover, even if any of the statements could be
inferred to have been a factor in her discipline, defendants
present undisputed evidence that Hayes committed the misconduct
and that the discipline imposed was in accordance with applicable
rules.  The evidence would only support that Hayes would have
been disciplined regardless of any protected activity in which
she may have engaged.

Hayes has not provided evidence supporting that she engaged in protected activity that was a cause of any decision to subject her to an adverse action. Hayes's claims will be dismissed in their entirety based on res judicata. Alternatively, the claims would be dismissed for failing on their merits.

### D. Loveless

Loveless contends she was disciplined for refusing to provide testimony that Simmons committed patient abuse. Defendants contend her claims fail because (a) she did not engage in protected activity; (b) she cannot show that her purported protected activity was a motivating factor in her discharge; and (c) she cannot show the personal participation of any individual defendant.

It is unclear whether Loveless, who is still employed as an R.N. II, seeks any relief against IDHS. She does not expressly set forth what relief she seeks. Perhaps, if successful on her official capacity claim, she could seek to have the one-day suspension expunged from her personnel record. See Elliott v. Hinds, 786 F.2d 298, 302 (7th Cir. 1986).

Loveless contends she was being coerced into providing false testimony that Simmons committed abuse and that she was suspended for failing to provide such testimony. Citing political patronage cases, Loveless contends that workplace discipline cannot be imposed in order to coerce a public employee's beliefs. See Branti v. Finkel, 445 U.S. 507, 516

(1980); Rutan v. Republican Party of Illinois, 497 U.S. 62, 71
(1990). Those cases, however, concerned coercion regarding
political beliefs. Here, the dispute concerns speech, or lack
thereof, regarding private personnel issues. The dispute about
Simmons's possible abuse was a private grievance, not a matter of
public concern. Therefore, it does not implicate First Amendment
rights. See Durgins, 272 F.3d at 843. Compare McVey v. Stacy,
157 F.3d 271, 279 (4th Cir. 1998) (speech exposing falsifications
on governmental matters was speech on a matter of public
concern); Williams v. Board of Regents of University System of
Georgia, 629 F.2d 993, 1003 (5th Cir. 1980), cert. denied,
452 U.S. 926 (1981) (same); Harding v. Rosewell, 22 F. Supp. 2d
806, 813-14 (N.D. Ill. 1998) (same); Runyon v. New York City
Transit Authority, 2002 WL 31093609 *4 n.1 (S.D.N.Y. Sept. 18,
2002) (same). Since Loveless cannot show that her First
Amendment rights were implicated, her claims must fail.

Even if the alleged coercion implicates First Amendment
rights, Loveless's claims would fail. It is undisputed that IDHS
rules provide that, pending the completion of an investigation of
the matter, a supervisor must be removed from patient contact if
there are allegations of abuse occurring in her presence and she
did not report the abuse. Thus, Loveless's reassignment was
mandatory regardless of the truth or falsity of Brown's
accusations. Ultimately, Simmons was not suspended based on any
finding of abuse and the record does not establish that Loveless
was suspended for failing to report abuse that had not actually

occurred. The record only indicates that the policy or procedure she was found to have violated had something to do with patient restraints. There is nothing to show that the individual defendants who signed off on the one-day suspension did so based on plaintiff refusing to provide testimony that Simmons abused the patient.

For the foregoing reasons, Loveless has failed to support a genuine factual dispute that she was retaliated against in violation of her First Amendment rights. Loveless's claims will be dismissed in their entirety.

### E. Mungai

Defendants contend Mungai's claims fail because he cannot show (a) he engaged in protected activity; (b) he suffered any adverse action; or (c) that any purported adverse action was motivated by his purported protected activity.

The only adverse action of which Mungai presently complains is his transfer to a more dangerous assignment. <u>See</u> Pl. Answer Brief at 25. As has been previously discussed, <u>see</u> § III(A) <u>supra</u>, that constitutes an adverse action for purposes of his First Amendment claim.

Mungai contends being assigned to the more dangerous location was retaliation for his writing to his supervisor and complaining that he or the patient should be assigned to a different location. <u>See</u> Pl. Answer Brief at 25. That letter, however, concerned a personal grievance regarding his own particular situation. It does not constitute speech on a matter

of public concern. See § III(A) supra. Therefore, Mungai's claims must fail. Additionally, there is no evidence that any of the individual defendants were even aware of this letter or his transfer. As to the official capacity claims, the transfer was not discipline that need be expunged from his personnel record and Mungai is not presently assigned to the purportedly more dangerous unit; thus, there would be no basis for declaratory or injunctive relief.

### F. Simmons

Simmons contends that his three-day suspension was retaliation for exercising his right to have his lawyer present when questioned by the Illinois State Police and also for engaging in union activity. Defendants contend his claims fail because he cannot show (a) he engaged in protected activity or (b) that the suspension was motivated by the purported protected activity. The individual defendants also contend they are entitled to qualified immunity for any claim based on his right to have his attorney present.

There is no evidence that any of the individual defendants were aware of Simmons's advocacy regarding safety and discipline. Therefore, for purposes of their possible liability, it is unnecessary to consider whether this constituted speech on a matter of public concern. In 1998, Simmons did have one discussion with Strickland, who recommended the suspension, regarding employee discipline and management decisions regarding work hours. Simmons, however, cannot recall any specifics of

this discussion so he cannot establish that it constituted speech on a matter of public concern. In any event, there is also no evidence connecting this discussion with Strickland's subsequent decision to recommend the suspension.[15]

Varso was aware that plaintiff had been a union steward in 1997 or 1998, including that he represented employees at grievance proceedings. However, there is no evidence that he provided representation on any grievances that concerned matters of a public concern nor is there any evidence that, as a steward, he advocated on behalf of the union. Simmons has not shown that his activity as a union steward included speech on matters of a public concern. However, to the extent it could be shown that Varso retaliated against Simmons simply for being an official of the union, it would implicate First Amendment associational rights. See Balton, 133 F.3d at 1041 (Cudahy, J., concurring in judgment) (citing McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968)).

As to his insistence on having his attorney present for questioning, Simmons cites Pugh v. City of Attica, Ind., 259 F.3d 619, 630 (7th Cir. 2001). That case, however, did not hold that the First Amendment protects against retaliation for requesting an attorney's presence when questioned by an employer and the police. First, it involved contacting an attorney regarding

---

[15]The motivation of decisionmakers other than the individual defendants would be relevant to an official capacity claim for possible injunctive relief expunging the record of his suspension.

filing a possible civil harassment lawsuit, not asking to have an attorney present when questioned by police or a public employer. See id. at 622-23, 625. More importantly, the Seventh Circuit simply assumed, without deciding, that a First Amendment right was implicated since the retaliation claim was subject to dismissal on other grounds. See id. at 630. Legal representation could only implicate the First Amendment where the employee is attempting to petition the government for redress or attempting to pursue a lawsuit that raises a matter of public concern. See Glatt, 87 F.3d at 193; Zorzi, 30 F.3d at 896-97. That is not the situation here.

Simmons also makes reference to Miranda v. State of Arizona, 384 U.S. 436 (1966). Neither party, though, provides a discussion that touches on the extensive Fifth Amendment case law regarding the questioning of criminal suspects by law enforcement personnel or public employers investigating employee conduct that may be criminal. Any right to have counsel present during Simmons's questioning by IDHS Security and the State Police would be a Fifth Amendment right. It is well established that a public employee cannot be substantially sanctioned in his employment for invoking the Fifth Amendment right to remain silent. Lefkowitz v. Cunningham, 431 U.S. 801, 805-06 (1977); Gardner v. Broderick, 392 U.S. 273 (1968); Atwell v. Lisle Park District, 286 F.3d 987, 990 (7th Cir. 2002); Chan v. Wodnicki, 123 F.3d 1005, 1008-09 (7th Cir. 1997), cert. denied, 522 U.S.

1117 (1998). To be violative, the sanction must be substantial enough to be coercive. Chan, 123 F.3d at 1009.

The presence of the State Police at the interview was not of particular significance because, in this type of situation, the State of Illinois is treated as a unified entity; questioning by the employing agency is treated the same as questioning by a prosecutor. Atwell, 286 F.3d at 990. A government agency that insists on requiring its employee to answer questions that may implicate the employee in criminal wrongdoing does so under an express or implicit grant of use immunity from criminal prosecution. Id. Thus, the government agency may compel answers, but no prosecutor, state or federal, may use such compelled testimony in a criminal prosecution. Id. Seventh Circuit case law requires that a public employer asking potentially incriminating questions first warn the employee that because the case law entitles the employee to immunity, the employee may not refuse to answer on the ground that the answers may incriminate the employee. Id. However, there is no duty to provide that warning until the incriminating question is actually asked. Id. at 991. The warning need not be given when the employee is scheduled for an interview; only when the question is actually asked at the interview. Id. "The employee has no right to skip the interview merely because he has reason to think he'll be asked questions the answers to which are incriminating. He may be asked other questions as well. Or he may be told that he can take the Fifth without repercussions. Or that the

interviewer will merely draw an adverse inference from the employee's taking the Fifth, which is permitted in civil cases." Id. If the employee refuses to come in for an interview, he or she may be disciplined for insubordination, including a discharge. Id. at 990-92. A "public employer may discharge an employee for refusal to answer where the employer both asks specific questions relating to the employee's official duties and advises the employee of the consequences of his choice, i.e., that failure to answer will result in dismissal but that answers he gives and fruits thereof cannot be used against him in criminal proceedings." Confederation of Police v. Conlisk, 489 F.2d 891, 894 (7th Cir. 1973), cert. denied, 416 U.S. 956 (1974). See also United States v. Devitt, 499 F.2d 135, 141 (7th Cir. 1974), cert. denied, 421 U.S. 975 (1975).

No case has been found which considers whether a public employee has a Fifth Amendment right to have counsel present during an interview related to an investigation in which criminal misconduct is implicated. However, since no statement that is given may be used against the employee in a criminal prosecution, no Fifth Amendment right to counsel may be implicated. It is held that Simmons did not have a constitutional right to have his counsel present during the interview.[16]

---

[16]Even if such a right existed and plaintiff could show that one of the individual defendants violated that right, the defendant would be entitled to qualified immunity since the right was not clearly established at the time Simmons was suspended.

Even if the presence of the State Police at the interview should be separately considered, it also does not implicate the constitutional right to have counsel present. The Sixth Amendment right to counsel does not attach until a criminal prosecution is commenced. Texas v. Cobb, 532 U.S. 162, 167-68 (2001) (quoting McNeil v. Wisconsin, 501 U.S. 171, 175 (1991)). No criminal prosecution was ever commenced as against Simmons. Therefore, he must rely on the Fifth Amendment right to counsel. The Fifth Amendment right to have counsel present during questioning by the police, however, is limited to questioning that is conducted while the person is in custody. United States v. Wyatt, 179 F.3d 532, 537 (7th Cir. 1999); Tukes v. Dugger, 911 F.2d 508, 514-15 (11th Cir. 1990), cert. denied, 502 U.S. 898 (1991); United States v. Sprouse, 2002 WL 15866 *4 (W.D. Va. Jan. 8, 2002); United States v. Hampton, 153 F. Supp. 2d 1262, 1273 (D. Kan. 2001). The fact that the IDHS inspector directed him to appear for the interview does not make it a custodial interrogation. See United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (civilian Air Force employee ordered by supervisor to report for interview with special investigators); United States v. Mahan, 190 F.3d 416, 421 (6th Cir. 1999) (private sector employee was summoned by supervisor to come to work conference room and be interviewed by FBI agent); United States v. Leese, 176 F.3d 740, 743-44 (3d Cir.), cert. denied, 528 U.S. 914 (1999) (supervisor ordered postal employee to speak with postal inspectors in the postmaster's office). Cf.

<u>Driebel v. City of Milwaukee</u>, 298 F.3d 622, 638-39 (7th Cir. 2002) (Police officer was ordered to report for questioning by supervisory officers; in <u>Driebel</u>, the court relied in part on the fact that a police department is a paramilitary organization which places certain restrictions on its officers and requires that they obey orders). Simmons did not appear at the scheduled interview that was the basis for his discipline. However, there is no evidence that the IDHS inspector informed him of any restrictions that would be imposed at that interview. Also, as to the interview that did finally occur with his attorney present, Simmons points to no evidence that that interview was conducted in a custodial manner. Even if the expected presence of the State Police at the scheduled interview would override the usual rules applicable to investigatory interviews of public employees, Simmons would not have had a Fifth Amendment right to have counsel present at the interview because it was not to be a custodial interview.

The three-day suspension did not deprive Simmons of any Fifth Amendment right. Simmons had no constitutional right to have his attorney present. Therefore, even if his request to have an attorney present was negatively considered by any of the decisionmakers, that did not implicate any constitutional right. The decision to discipline Simmons for purportedly refusing to appear at the interview when first scheduled also did not violate any constitutional right. <u>See</u> <u>Atwell</u>, 286 F.3d at 990-92; <u>Conlisk</u>, 489 F.2d at 894. On the facts assumed to be true for

present purposes, that decision was not based on an accurate factual account of the conversation between Simmons and Zepeda regarding the October 18, 1999 interview appointment. Inaccurate factual determinations, however, do not by themselves violate constitutional rights. Compare Modrowski v. Department of Veterans Affairs, 252 F.3d 1344, 1352 (Fed. Cir. 2001) (on review of decision of Merit Service Protection Board, disciplining employee for appearing at interview but failing to answer questions until after he could talk to his attorney a week later was reversible on arbitrary and capricious review, without need to consider whether the employee had a constitutional right to consult his attorney).

Any First Amendment claim by Simmons is limited to showing that Varso retaliated against him for being a union Steward. No sufficient evidence is presented linking Varso's December 1999 approval of Simmons' suspension to her awareness in 1997 or 1998 that he was a union steward. Simmons's claims will be dismissed in their entirety.

### G. Taylor

Taylor contends he was retaliated against for requesting union representation at a predisciplinary hearing. Defendants contend his claims fail because he cannot show (a) that he engaged in protected activity; (b) that he suffered an adverse action; or (c) that any purported adverse action was motivated by his purported protected activity.

Taylor was not involved in any grievance in which he raised anything other than personal issues regarding his conduct. Taylor did not engage in any speech that raised a matter of public concern. Therefore, he cannot succeed on his First Amendment claims. Taylor's claims will be dismissed in their entirety.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [48] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants Illinois Department of Human Services, Linda Renee Baker, Patricia Madden, Suzanne Varso, and Ugo Formigoni and against plaintiffs Lester Brodzik, Evelyn Carreon, Nasser Diab, Agnes Hayes, Ruth Loveless, Joseph Mungai, Ron Simmons, Henry Taylor, and William Thompson dismissing plaintiffs' causes of action with prejudice.

ENTER:

William T Hart
UNITED STATES DISTRICT JUDGE

DATED: OCTOBER 28, 2003

# United States District Court
## Northern District of Illinois
### Eastern Division

DENISE BERRY, et al.

v.

ILLINOIS DEPT. OF HUMAN
SERVICES, et al.

**JUDGMENT IN A CIVIL CASE**

Case Number: 00 C 5538

☐    Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■    Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that defendants' motion for summary judgment is granted. Judgment is entered in favor of defendants Illinois Department of Human Services, Linda Renee Baker, Patricia Madden, Suzanne Varso, and Ugo Formigoni and against plaintiffs Lester Brodzik, Evelyn Carreon, Nasser Diab, Agnes Hayes, Ruth Loveless, Joseph Mungai, Ron Simmons, Henry Taylor, and William Thompson dismissing plaintiffs' causes of action with prejudice. No costs are awarded as against plaintiffs Lester Brodzik and William Thompson.

Michael W. Dobbins, Clerk of Court

Date: 10/28/2003

Carol Wing, Deputy Clerk